**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

ALTERA CORPORATION &
SUBSIDIARIES,
　　　　　*Petitioner-Appellee*,

v.

COMMISSIONER OF INTERNAL
REVENUE,
　　　　　*Respondent-Appellant.*

Nos. 16-70496
16-70497

Tax Ct. Nos.
6253-12
9963-12

OPINION

Appeal from Decisions of the
United States Tax Court

Argued and Submitted October 16, 2018
San Francisco, California

Filed June 7, 2019

Before: Sidney R. Thomas, Chief Judge, and Susan P.
Graber* and Kathleen M. O'Malley,** Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge O'Malley

---

*The Honorable Stephen R. Reinhardt was originally assigned to this panel. Following his death, the Honorable Susan P. Graber was drawn by lot to replace him on the panel.

**The Honorable Kathleen M. O'Malley, United States Circuit Judge for the U.S. Court of Appeals for the Federal Circuit, sitting by designation.

## SUMMARY***

### Tax

The panel reversed a decision of the Tax Court that 26 C.F.R. § 1.482-7A(d)(2), under which related entities must share the cost of employee stock compensation in order for their cost-sharing arrangements to be classified as qualified cost-sharing arrangements, was invalid under the Administrative Procedure Act.

At issue was the validity of the Treasury regulations implementing 26 U.S.C. § 482, which provides for the allocation of income and deductions among related entities. The panel first held that the Commissioner of Internal Revenue did not exceed the authority delegated to him by Congress under 26 U.S.C. § 482. The panel explained that § 482 does not speak directly to whether the Commissioner may require parties to a QCSA to share employee stock compensation costs in order to receive the tax benefits associated with entering into a QCSA. The panel held that the Treasury reasonably interpreted § 482 as an authorization to require internal allocation methods in the QCSA context, provided that the costs and income allocated are proportionate to the economic activity of the related parties, and concluded that the regulations are a reasonable method for achieving the results required by the statute. Accordingly, the regulations were entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel next held that the regulations at issue were not arbitrary and capricious under the Administrative Procedure Act.

Dissenting, Judge O'Malley would find, as the Tax Court did, that 26 C.F.R. § 1.482-7A(d)(2) is invalid as arbitrary and capricious.

---

**COUNSEL**

Arthur T. Catterall (argued), Richard Farber, and Gilbert S. Rothenberg, Attorneys; Travis A. Greaves, Deputy Assistant Attorney General; Richard E. Zuckerman, Principal Deputy Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Respondent-Appellant.

Donald M. Falk (argued), Mayer Brown LLP, Palo Alto, California; Thomas Kittle-Kamp and William G. McGarrity, Mayer Brown LLP, Chicago, Illinois; Brian D. Netter and Travis Crum, Mayer Brown LLP, Washington, D.C.; A. Duane Webber, Phillip J. Taylor, and Joseph B. Judkins, Baker & McKenzie LLP, Washington, D.C.; for Petitioner-Appellee.

Susan C. Morse, University of Texas School of Law, Austin, Texas; Stephen E. Shay and Allison Bray, Certified Law Students, Harvard Law School, Cambridge, Massachusetts; for Amici Curiae J. Richard Harvey, Reuven Avi-Yonah, Lily Batchelder, Joshua Blank, Noël Cunningham, Victor Fleischer, Ari Glogower, David Kamin, Mitchell Kane, Michael Knoll, Rebecca Kysar, Leandra Lederman, Zachary Liscow, Ruth Mason, Susan Morse, Daniel Shaviro, Stephen

Shay, John Steines, David Super, Clinton Wallace, and Bret Wells.

Jonathan E. Taylor, Gupta Wessler PLLC, Washington, D.C.; Clint Wallace, Vanderbilt Hall, New York, New York; for Amici Curiae Anne Alstott, Reuven Avi-Yonah, Lily Batchelder, Joshua Blank, Noel Cunningham, Victor Fleischer, Ari Glogower, David Kamin, Mitchell Kane, Sally Katzen, Edward Kleinbard, Michael Knoll, Rebecca Kysar, Zachary Liscow, Daniel Shaviro, John Steines, David Super, Clint Wallace, and George Yin.

Larissa B. Neumann, Ronald B. Schrotenboer, and Kenneth B. Clark, Fenwick & West LLP, Mountain View, California, for Amicus Curiae Xilinx Inc.

Christopher J. Walker, The Ohio State University Moritz College of Law, Columbus, Ohio; Kate Comerford Todd, Steven P. Lehotsky, and Warren Postman, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

John I. Forry, San Diego, California, for Amicus Curiae TechNet.

Alice E. Loughran, Michael C. Durst, and Charles G. Cole, Steptoe & Johnson LLP, Washington, D.C.; Bennett Evan Cooper, Steptoe & Johnson LLP, Phoenix, Arizona; for Amici Curiae Software and Information Industry Association, Financial Executives International, Information Technology Industry Council, Silicon Valley Tax Directors Group, Software Finance and Tax Executives Counsel, National Association of Manufacturers, American Chemistry Council, BSA | the Software Alliance, National Foreign Trade

Council, Biotechnology Innovation Organization, Computing Technology Industry Association, The Tax Council, United States Council for International Business, Semiconductor Industry Association.

Kenneth P. Herzinger and Eric C. Wall, Orrick Herrington & Sutcliffe LLP, San Francisco, California; Peter J. Connors, Orrick Herrington & Sutcliffe LLP, New York, New York; for Amici Curiae Charles W. Calomiris, Kevin H. Hassett, and Sanjay Unni.

Roderick K. Donnelly and Neal A. Gordon, Morgan Lewis & Bockius LLP, Palo Alto, California; Thomas M. Peterson, Morgan Lewis & Bockius LLP, San Francisco, California; for Amicus Curiae Cisco Systems Inc.

Christopher Bowers, David Foster, Raj Madan, and Royce Tidwell, Skadden Arps Slate Meagher & Flom LLP, Washington, D.C.; Nathaniel Carden, Skadden Arps Slate Meagher & Flom LLP, Chicago, Illinois; for Amicus Curiae Amazon.com Inc.

## OPINION

THOMAS, Chief Judge:

This appeal presents the question of the validity of 26 C.F.R. § 1.482-7A(d)(2),[1] under which related business entities must share the cost of employee stock compensation in order for their cost-sharing arrangements to be classified as qualified cost-sharing arrangements ("QCSA"). Although the case appears complex, the dispute between the Department of the Treasury and the taxpayer is relatively straightforward. The parties agree that, under the governing tax statute, the "arm's length" standard applies; but they disagree about how the standard may be met. The taxpayer argues that Treasury must employ a specific method to meet the arm's length standard: a comparability analysis using comparable transactions between unrelated business entities. Treasury disagrees that the arm's length standard requires the specific comparability *method* in all cases. Instead, the standard generally requires that Treasury reach an arm's length *result* of tax parity between controlled and uncontrolled business entities. With respect to the transactions at issue here, the governing statute allows Treasury to apply a purely internal method of allocation, distributing the costs of employee stock options in proportion to the income enjoyed by each related taxpayer.

Our task, of course, is not to assess the better tax policy, nor the wisdom of either approach, but rather to examine

---

[1] The 2003 amendments are at issue. Although they are still in effect, the Tax Code has been reorganized, and what was § 1.482-7 in 2003 is now numbered § 1.482-7A. To minimize confusion, our citations are to the current version of the regulation unless otherwise specified.

whether Treasury's regulations are permitted under the statute. Applying the familiar tools used to examine administrative agency regulations, we conclude that the regulations withstand scrutiny. Therefore, we reverse the judgment of the Tax Court.

I

For many years, Congress and the Treasury have been concerned with American businesses avoiding taxes through the creation and use of related business entities. In the last several decades, Congress has directed particular attention to the potential for tax abuse by multinational corporations with foreign subsidiaries. If, for example, the parent business entity is in a high-tax jurisdiction, and the foreign subsidiary is in a low-tax jurisdiction, the business enterprise can shift costs and revenue between the related entities so that more taxable income is allocated to the lower tax jurisdiction. Similarly, a parent and foreign subsidiary can enter into significant tax-avoiding cost sharing arrangements.

This potential for tax abuse is generally not present when similar transactions occur between unrelated business entities. In those instances, each separate unrelated entity has the incentive to maximize profit, and thus to allocate costs and income consistent with economic realities. However, among related parties, those incentives do not exist. Rather, among related parties, after-tax maximization of profit may depend on how costs and income are allocated between the parent and the subsidiary regardless of economic reality, given that after-tax profits are commonly shared.

The concern about tax avoidance through the use of related business entities is not new. In the Revenue Act of

1928, Congress granted the Secretary of the Treasury the authority to reallocate the reported income and costs of related businesses "in order to prevent evasion of taxes or clearly to reflect the income of any such trades or businesses." Revenue Act of 1928, ch. 852, § 45, 45 Stat. 791, 806. This statute was designed to give Treasury the flexibility it needed to prevent transaction-shuffling between related entities for the purpose of decreasing tax liability. *See* H.R. REP. NO. 70-2, at 16–17 (1927) ("[T]he Commissioner may, in the case of two or more trades or businesses owned or controlled by the same interests, apportion, allocate, or distribute the income or deductions between or among them, as may be necessary in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking'), and in order clearly to reflect their true tax liability."); *accord* S. REP. NO. 70-960, at 24 (1928). The purpose of the statute was "to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer." *Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972) (quoting 26 C.F.R. § 1.482-1(b)(1) (1971)). In short, the primary aim of the statute was to prevent tax evasion by related business taxpayers.[2]

In 1934, the Commissioner adopted regulations implementing the statute and first adopted the familiar "arm's length" standard: "The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Treas. Reg. 86, art. 45-1(b) (1935). In the context of a controlled transaction,

---

[2] An important, but secondary purpose was to avoid double taxation of multi-national corporations, which the United States effected through various tax treaties. *See, e.g.*, Convention Concerning Double Taxation, Fr.-U.S., art. IV, Apr. 27, 1932, 49 Stat. 3145.

the arm's length standard is satisfied "if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)." 26 C.F.R. § 1.482-1(b)(1). The relevant regulation also noted: "However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances." *Id.*

Although the Secretary adopted the arm's length standard, courts did not hold related parties to that standard by exclusively requiring the examination of comparable transactions. For example, in *Seminole Flavor Co. v. Commissioner*, the Tax Court rejected a strict application of the arm's length standard in favor of an inquiry into whether the allocation of income between related parties was "fair and reasonable." 4 T.C. 1215, 1232 (1945); *see also id.* at 1233 ("Whether any such business agreement would have been entered into by petitioner with total strangers is wholly problematical."); *Grenada Indus., Inc. v. Comm'r*, 17 T.C. 231, 260 (1951) ("We approve an allocation . . . to the extent that such gross income in fact exceeded the fair value of the services rendered . . . ."). And in 1962, we collected various allocation standards and outright rejected the superiority of the arm's length bargaining analysis over all others:

> [W]e do not agree . . . that "arm's length bargaining" is the sole criterion for applying the statutory language of [26 U.S.C. § 482] in determining what the "true net income" is of each "controlled taxpayer." Many decisions have been reached under [§ 482] without

> reference to the phrase "arm's length bargaining" and without reference to Treasury Department Regulations and Rulings which state that the talismanic combination of words—"arm's length"—is the "standard to be applied in every case."

*Frank v. Int'l Canadian Corp.*, 308 F.2d 520, 528–29 (9th Cir. 1962).

*Frank* noted that "it was not any less proper . . . to use here the 'reasonable return' standard than it was for other courts to use 'full fair value,' 'fair price including a reasonable profit,' 'method which seems not unreasonable,' 'fair consideration which reflects arm's length dealing,' 'fair and reasonable,' 'fair and reasonable' or 'fair and fairly arrived at,' or 'judged as to fairness,' all used in interpreting [the statute]." *Id.* (footnotes omitted). We later limited *Frank* to situations in which "it would have been difficult for the court to hypothesize an arm's-length transaction." *Oil Base, Inc. v. Comm'r*, 362 F.2d 212, 214 n.5 (9th Cir. 1966). However, *Frank*'s central point remained: the arm's length standard based on comparable transactions was not the *sole* basis of reallocating costs and income under the statute.

In the 1960s, the problem of abusive transfer pricing practices created a new adherence to a stricter arm's length standard. In response to concerns about the undertaxation of multinational business entities, Congress considered reworking the Tax Code to resolve the difficulty posed by the application of the arm's length standard to related party transactions. H.R. REP. No. 87-1447, at 28–30 (1962). However, it instead asked Treasury to "explore the possibility of developing and promulgating regulations . . . which would

provide additional guidelines and formulas for the allocation of income and deductions" under 26 U.S.C. § 482. H.R. REP. NO. 87-2508, at 19 (1962) (Conf. Rep.), *as reprinted in* 1962 U.S.C.C.A.N. 3732, 3739. Legislators believed that § 482 authorized the Secretary to employ a profit-split allocation method without amendment. *Id.*; H.R. REP. No. 87-1447, at 28–29. In 1968, following Congress's entreaty, Treasury finalized the first regulation tailored to the issue of intangible property development in QCSAs. 26 C.F.R. § 1.482-2(d) (1968).

The 1968 regulations "constituted a radical and unprecedented approach to the problem they addressed—notwithstanding their being couched in terms of the 'arm's length standard,' and notwithstanding that that standard had been the nominal standard under the regulations for some 30 years." Stanley I. Langbein, *The Unitary Method and the Myth of Arm's Length*, 30 TAX NOTES 625, 644 (1986). In addition to three arm's length pricing methods, the 1968 regulations included a "fourth method," which was essentially open-ended: "Where none of the three methods of pricing . . . can reasonably be applied under the facts and circumstances as they exist in a particular case, some appropriate method of pricing other than those described . . . , or variations on such methods, can be used." 26 C.F.R. § 1.482-2(e)(1)(iii) (1968).

Following the promulgation of the 1968 regulation, courts continued to employ a comparability analysis, but not to the exclusion of other methodologies. Reuven S. Avi-Yonah, *The Rise & Fall of Arm's Length: A Study in the Evolution of U.S. International Taxation*, 15 VA. TAX REV. 89, 108–29 (1995). Indeed, a study determined that direct comparable transactions were located and applied in only 3% of the

Internal Revenue Service's adjustments prior to the 1986 amendment.  U.S. GEN. ACCOUNTING OFFICE., GGD-81-81, IRS COULD BETTER PROTECT U.S. TAX INTERESTS IN DETERMINING THE INCOME OF MULTINATIONAL CORPORATIONS (1981).  The decades following the 1968 regulations involved

> a gradual realization by all parties concerned, but especially Congress and the IRS, that the [comparability method of meeting the arm's length standard], firmly established . . . as the sole standard under section 482, did not work in a large number of cases, and in other cases its misguided application produced inappropriate results.  The result was a deliberate decision to retreat from the standard while still paying lip service to it.

Avi-Yonah, *supra*, at 112; *see also* James P. Fuller, *Section 482:  Revisited Again*, 45 TAX L. REV. 421, 453 (1990) ("[T]he 1986 Act's commensurate with income standard is not really a new approach to § 482.").

Ultimately, as controlled transactions increased in frequency and complexity, particularly with respect to intangible property, Congress determined that legislative action was necessary.  The Tax Reform Act of 1986 reflected Congress's view that strict adherence to the comparability method of meeting the arm's length standard prevented tax parity.  Thus, the Tax Reform Act of 1986 added a sentence to § 482 that largely forms the basis of the present dispute, providing that:

> In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Tax Reform Act of 1986, 26 U.S.C. § 482 (1986) (as amended 2018).

The House Ways and Means Committee recommended the addition of the commensurate with income clause because it was "concerned" that the current code and regulations "may not be operating to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles." H.R. REP. NO. 99-426, at 423 (1985). The clause was intended to correct a "recurrent problem"—"the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables." *Id.* at 423–24.

The House Report makes clear that the committee intended the commensurate with income standard to displace a comparability analysis where comparable transactions cannot be found:

> A fundamental problem is the fact that the relationship between related parties is different from that of unrelated parties. . . . [M]ultinational companies operate as an economic unit, and not "as if" they were unrelated to their foreign subsidiaries. . . .
>
> . . . .

Certain judicial interpretations of section 482 suggest that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe harbor" for related party pricing arrangements, even though there are significant differences in the volume and risks involved, or in other factors. While the committee is concerned that such decisions may unduly emphasize the concept of comparables even in situations involving highly standardized commodities or services, it believes that such an approach is sufficiently troublesome where transfers of intangibles are concerned that a statutory modification to the intercompany pricing rules regarding transfers of intangibles is necessary.

. . . .

. . . There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. The committee thus concludes that it is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation . . . be commensurate with the income attributable to the intangible. . . .

. . . .

. . . [T]he committee intends to make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor minimum payment for related party intangible transfers.    Where taxpayers transfer intangibles with a high profit potential, the compensation for the intangibles should be greater than industry averages or norms.

*Id.* at 424–25 (footnote and citation omitted).[3]

Treasury's first response to the Tax Reform Act was the "White Paper," an intensive study published in 1988. *A Study of Intercompany Pricing Under Section 482 of the Code*, I.R.S. Notice 88-123, 1988-2 C.B. 458 ("White Paper"). The White Paper confirmed that Treasury believed the commensurate with income standard to be consistent with the arm's length standard (and that Treasury understood Congress to share that understanding). *Id.* at 475. Treasury wrote that a comparability analysis must be performed where possible, *id.* at 474, but it also suggested a "clear and convincing evidence" standard for comparable transactions, indicating that a comparability analysis would rarely be possible. *Id.* at 478.

---

[3] The Conference Committee suggested only one change—to broaden the sweep of the amendment so as to encompass domestic related-party transactions—in order to better serve the objective of the amendment, "that the division of income between related parties reasonably reflect the relative economic activity undertaken by each." H.R. REP. NO. 99-841, at II-637 (1986) (Conf. Rep.), *as reprinted in* 1986 U.S.C.C.A.N. 4075, 4725. The Report also clarified that cost-sharing arrangements would not generally be subject to § 482 allocations—but only "if and to the extent . . . the income allocated among the parties reasonably reflect the actual economic activity undertaken by each." *Id.* at II-638.

The White Paper signaled a shift in the interpretation of the arm's length standard as it had been defined following the 1968 regulations. Treasury advanced a new allocation method, the "basic arm's length return method," White Paper at 488, that would apply only in the absence of comparable transactions and would essentially split profits between the related parties, *id.* at 490. Commentators understood that, by attempting to synthesize the arm's length standard and the commensurate with income provision, Treasury was moving away from a view that the arm's length standard always requires a comparability analysis. Marc M. Levey, Stanley C. Ruchelman, & William R. Seto, *Transfer Pricing of Intangibles After the Section 482 White Paper*, 71 J. TAX'N 38, 38 (1989); Josh O. Ungerman, Comment, *The White Paper: The Stealth Bomber of the Section 482 Arsenal*, 42 SW. L.J. 1107, 1128–29 (1989).

In 1994 and 1995, Treasury issued new regulations that defined the arm's length standard as result-oriented, meaning that the goal is parity in *taxable income* rather than parity in the method of allocation itself. 26 C.F.R. § 1.482-1(b)(1) (1994) ("A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)."). However, the arm's length standard remained "the standard to be applied in every case." *Id.*

The regulations also set forth methods by which income could be allocated among related parties in a manner consistent with the arm's length standard. *Id.* § 1.482-1(b)(2)(i) (1994). According to Treasury, the 1994 regulations defined the arm's length standard in terms of "the

results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances." Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997-01, 48,998 (proposed July 29, 2002).

The 1995 regulation provided that "[i]ntangible development costs" included "all of the costs incurred by [a controlled] participant related to the intangible development area." 26 C.F.R. § 1.482-7(d)(1) (1995). By contrast to the 1994 regulation, the 1995 regulation—consistent with the 1986 Conference Report —"implement[ed] the commensurate with income standard in the context of cost sharing arrangements" by "requir[ing] that controlled participants in a [QCSA] share all costs incurred that are related to the development of intangibles in proportion to their shares of the reasonably anticipated benefits attributable to that development." Compensatory Stock Options Under Section 482, 67 Fed. Reg. at 48,998.

Neither the Tax Reform Act nor the implementing regulations specifically addressed allocation of employee stock compensation, which is the issue in this dispute. However, that omission was unsurprising given that the practice did not develop on a major scale until the 1990s. Zvi Bodie, Robert S. Kaplan, & Robert C. Merton, *For the Last Time: Stock Options Are an Expense*, HARV. BUS. REV., Mar. 2003, at 62, 67. Beginning in 1997, the Secretary interpreted the "all . . . costs" language to include stock-based compensation, meaning that controlled taxpayers had to share the costs (and associated deductions) of providing employee stock compensation. *Xilinx, Inc. v. Comm'r*, 598 F.3d 1191, 1193–94 (9th Cir. 2010).

In 2003, Treasury issued the cost-sharing regulations that are challenged in this case. Treasury intended for the 2003 amendments to clarify, rather than to overhaul, the 1994 and 1995 regulations. The clarifications were twofold. First, the amendments directly classified employee stock compensation as a cost to be allocated between QCSA participants. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,998; 26 C.F.R. § 1.482-7A(d)(2). Second, the "coordinating amendments" clarified Treasury's belief that the cost-sharing regulations, including § 1.482-7A(d)(2), operate to produce an arm's length result. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,998; 26 C.F.R. § 1.482-7A(a)(3).

Specifically, § 1.482-7A provides that costs shared by related parties to a QCSA are not subject to IRS reallocation for tax purposes if each entity's share of the intangible property development costs equals each entity's reasonably anticipated benefits. Section 1.482-7A(a)(3) incorporates and coordinates with the arm's length standard:

> A qualified cost sharing arrangement produces results that are consistent with an arm's length result . . . if, and only if, each controlled participant's share of the costs (as determined under paragraph (d) of this section) of intangible development under the qualified cost sharing arrangement equals its share of reasonably anticipated benefits attributable to such development . . . .

Section 1.482-7A(d)(2) provides that parties to a QCSA must allocate stock-based compensation between themselves:

[In a QCSA], a controlled participant's operating expenses include all costs attributable to compensation, including stock-based compensation. As used in this section, the term stock-based compensation means any compensation provided by a controlled participant to an employee or independent contractor in the form of equity instruments, options to acquire stock (stock options), or rights with respect to (or determined by reference to) equity instruments or stock options, including but not limited to property to which section 83 applies and stock options to which section 421 applies, regardless of whether ultimately settled in the form of cash, stock, or other property.

These regulations, and the procedure employed in adopting them, form the basis of the present controversy.

II

At issue is Altera Corporation ("Altera") & Subsidiaries' tax liability for the years 2004 through 2006. During the relevant period, Altera and its subsidiaries designed, manufactured, marketed, and sold programmable logic devices, which are electronic components that are used to build circuits.

In May of 1997, Altera entered into a cost-sharing agreement with one of its foreign subsidiaries, Altera International, Inc., a Cayman Islands corporation ("Altera International"), which had been incorporated earlier that year. Altera granted to Altera International a license to use and

exploit Altera's preexisting intangible property everywhere in the world except the United States and Canada.   In exchange, Altera International paid royalties to Altera.   The parties agreed to pool their resources to share research and development ("R&D") costs in proportion to the benefits anticipated from new technologies.   The question in this appeal is whether Treasury was permitted, for tax liability purposes, to re-allocate the cost of employee stock-based compensation.

Altera and the IRS agreed to an Advance Pricing Agreement covering the 1997–2003 tax years.  Pursuant to this agreement, Altera shared with Altera International stock-based compensation costs as part of the shared R&D costs. After the Treasury regulations were amended in 2003, Altera and Altera International amended their cost-sharing agreement to comply with the modified regulations, continuing to share employee stock compensation costs.

The agreement was amended again in 2005 following the Tax Court's opinion in *Xilinx Inc. & Consolidated Subsidiaries v. Commissioner*, which involved a challenge to the 1994–1995 cost-sharing regulations.  125 T.C. 37 (2005). The parties agreed to "suspend the payment of any portion of [a] Cost Share . . . to the extent such payment relates to the Inclusion of Stock-Based Compensation in R&D Costs" unless and until a court upheld the validity of the 2003 cost-sharing regulations.   The following provision explains Altera's reasoning:

> The Parties believe that it is more likely than not that (i) the Tax Court's conclusion in *Xilinx v. Commissioner*, 125 T.C. [No.] 4 (2005), that the arm's length standard controls

the determination of costs to be shared by controlled participants in a qualified cost sharing arrangement should also apply to Treas. Reg. § 1.482-7(d)(2) (as amended by T.D. 9088), and (ii) the Parties' inclusion of Stock-Based Compensation in R&D Costs pursuant to Amendment I would be contrary to the arm's length standard.

Altera and its U.S. subsidiaries did not account for R&D-related stock-based compensation costs on their consolidated 2004–2007 federal income tax returns. The IRS issued two notices of deficiency to the group, applying § 1.482-7(d)(2) to increase the group's income by the following amounts:

| 2004 | $ 24,549,315 |
| 2005 | $ 23,015,453 |
| 2006 | $ 17,365,388 |
| 2007 | $ 15,463,565 |

Altera timely filed petitions in the Tax Court. The parties filed cross-motions for summary judgment, and the Tax Court granted Altera's motion. Sitting en banc, the Tax Court held that § 1.482-7A(d)(2) is invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. *Altera Corp. & Subsidiaries v. Comm'r*, 145 T.C. 91 (2015).

The Tax Court unanimously determined: (1) that the Commissioner's allocation of income and expenses between related entities must be consistent with the arm's length standard; and (2) that the arm's length standard is not met unless the Commissioner's allocation can be compared to an

actual transaction between unrelated entities.  The Tax Court reasoned that the Commissioner could not require related parties to share stock compensation costs, because the Commissioner had not considered any unrelated party transactions in which the parties shared such costs.  The Tax Court held that the agency's decisionmaking process was fundamentally flawed because:  (1) it rested on speculation rather than on hard data and expert opinions; and (2) it failed to respond to significant public comments, particularly those pointing out uncontrolled cost-sharing arrangements in which the entities did not share stock compensation costs.  *Id.* at 133–34.

The Tax Court's decision rested largely on its own opinion in *Xilinx*, in which it determined that the arm's length standard mandates a comparability analysis. *Id.* at 118 (citing *Xilinx*, 125 T.C. at 53–55).  In its decision in this case, as well, the Tax Court suggested that the Commissioner cannot require related entities to share stock compensation costs unless and until the Commissioner locates uncontrolled transactions in which these costs are shared.  *Id.* at 118–19.

The Tax Court reached five holdings:  (1) the 2003 amendments constitute a final legislative rule subject to the requirements of the APA; (2) *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), provides the appropriate standard of review because the standard set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), incorporates *State Farm*'s " reasoned decisionmaking" standard; (3) Treasury did not support adequately its decision to allocate the costs of employee stock compensation between related parties;

(4) Treasury's procedural regulatory deficiencies were not harmless;[4] and (5) § 1.482-7A(d)(2) is invalid under the APA.

### III

Our task in this appeal, then, is to determine whether Treasury's 2003 regulations are lawful. In the context of the arguments made in this case, we evaluate the validity of the agency's regulations under both *Chevron* and *State Farm*, which "provide for related but distinct standards for reviewing rules promulgated by administrative agencies." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 521 (2d Cir. 2017). "*State Farm* is used to evaluate whether a rule is procedurally defective as a result of flaws in the agency's decisionmaking process." *Id.* "*Chevron*, by contrast, is generally used to evaluate whether the conclusion reached as a result of that process—an agency's interpretation of a statutory provision it administers—is reasonable." *Id.*[5] "A litigant challenging a rule may challenge it under *State Farm*, *Chevron*, or both."

---

[4] On appeal, the Commissioner does not claim that any error in the decisionmaking process, if it existed, was harmless. Thus, we decline to address the issue.

[5] There are circumstances when the two analyses may overlap. *See, e.g.*, *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 561 (D.C. Cir. 2016) (We are mindful that, "[i]n [some] situations, what is 'permissible' under *Chevron* is also reasonable under *State Farm*." (quoting *Arent v. Shalala*, 70 F.3d 610, 616 n.6 (D.C. Cir. 1995))).

*Id.* Altera challenges both the procedural adequacy of the APA process and the substance of the regulation.[6]

## A

We first turn to *Chevron* analysis.

### 1

Under *Chevron*, we first apply the traditional rules of statutory construction to determine whether "Congress has directly spoken to the precise question at issue." 467 U.S. at 842. We start with the plain statutory text and, "when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

In addition, we examine the legislative history, the statutory structure, and "other traditional aids of statutory interpretation" in order to ascertain congressional intent.

---

[6] We afforded the parties the opportunity to file optional supplemental briefs on the question whether the six-year statute of limitations under 28 U.S.C. § 2401(a)—which generally applies to procedural challenges to regulations under the APA—applies to this case. The Commissioner responded that it had waived this non-jurisdictional defense by failing to assert it to the Tax Court. We agree with the parties that the Commissioner waived the defense. *Day v. McDonough*, 547 U.S. 198, 210 n.11 (2006) ("[S]hould a State intelligently choose to waive a statute of limitations defense, a district court would not be at liberty to disregard that choice."); *Whidbee v. Pierce County*, 857 F.3d 1019, 1024 (9th Cir. 2017) ("[E]ven if a claim has expired under a state statute of limitations, a defendant can still waive this affirmative defense."). Therefore, we need not address it.

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981). If, after conducting that *Chevron* step one examination, we conclude that the statute is silent or ambiguous on the issue, we then defer to the agency's interpretation so long as it "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. A permissible construction is one that is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

Ultimately, questions of deference boil down to whether "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). "When Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* at 227 (quoting *Chevron*, 467 U.S. at 843–44).

Here, the resolution of our step one *Chevron* examination is straightforward. Section 482 does not speak directly to whether the Commissioner may require parties to a QCSA to share employee stock compensation costs in order to receive the tax benefits associated with entering into a QCSA. Thus, there is no question that the statute remains ambiguous regarding the method by which Treasury is to make allocations based on stock-based compensation.

Altera argues that the statute, by its terms, cannot apply to stock-based compensation. According to Altera, stock-

based compensation is not "transferred" between parties because only preexisting intangibles can be transferred. Thus, for Altera, Treasury has exceeded the delegation of authority apparent from the plain text of the statute.

We are not persuaded. When parties enter into a QCSA, they are *transferring* future distribution rights to intangibles, albeit intangibles that have yet to be developed. Indeed, the present-day transfer of those rights provides the main incentive for entering into a QCSA. The right to distribute intangibles to be developed later is, itself, one right in the bundle of property rights that exists at the time that parties enter into a QCSA.

Moreover, even assuming that the crucial transfer does not occur contemporaneously, § 482 applies "[i]n the case of *any* transfer . . . of intangible property" that produces income. (Emphasis added.) That phrasing is as broad as possible, and it cannot reasonably be read to exclude the transfers of expected intangible property. *See, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning . . . ."); *see also Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009) ("Of course the word 'any' (in the phrase 'any other provision of law') has an 'expansive meaning, giving us no warrant to limit the class of provisions of law [encompassed by the statutory provision]." (citation omitted)). Additionally, the sentence necessarily is forward-looking because the production of taxable income always follows the transfer.

In short, the text of the statute does not limit its application to preexisting intangibles in the way Altera's argument suggests. Because parties to a QCSA transfer cost-

shared intangibles—including stock-based compensation—they are subject to regulation under 26 U.S.C. § 482.

2

Thus, we must move on to *Chevron* step two to consider whether Treasury's interpretation of § 482 as to allocation of employee stock option costs is permissible. An agency's interpretation of statutory authority is examined "in light of the statute's text, structure and purpose." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007). The interpretation fails if it is "unmoored from the purposes and concerns" of the underlying statutory regime. *Judulang v. Holder*, 565 U.S. 42, 64 (2011). Thus, Congress's purpose in enacting and amending § 482 in 1986 is key to resolution of this issue.

The congressional purpose in enacting § 482 was to establish tax parity. *First Sec. Bank of Utah*, 405 U.S. at 400. In the 1986 amendments, Congress called for an approach to allocation of costs and income that would "reasonably reflect the actual economic activity undertaken by each [party to a QCSA]," H.R. REP. No. 99-841, at II-638 (1986) (Conf. Rep.). Put another way, Congress's objective in amending § 482 was to ensure that income follows economic activity. *Id.* at II-637. Although the 1986 amendment delegates to Treasury the choice of a specific methodology to achieve that end, it suggested: "In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." This standard is a purely internal one, that is, internal to the entity being taxed, and evidence supports Treasury's belief that Congress intended it to be. H.R. REP. NO. 99-426, at 423–35; H.R. REP. NO.

99-841, at II-637 (Conf. Rep.). In the QCSA context, Congress did not want to interfere with controlled cost-sharing arrangements, but only to the degree that the allocation of costs and income "reasonably reflect[s] the actual economic activity undertaken by each." H.R. REP. No. 99-841, at II-638 (Conf. Rep.). In light of this history, Treasury's decision to adopt a methodology that followed actual economic activity was reasonable.

So was Treasury's determination that uncontrolled cost-sharing arrangements do not provide helpful guidance regarding allocations of employee stock compensation. When it amended § 482 in 1986, Congress bemoaned the difficulties associated with finding and using data involving high-profit intangibles. *See* H.R. REP. NO. 99-426, at 425 ("There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. . . . [I]t is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation be commensurate with the income attributable to the intangible."); *see also* Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171-02, 51,173 (Aug. 26, 2003) (citing H.R. REP. NO. 99-426, at 423–25) ("As recognized in the legislative history of the Tax Reform Act of 1986, there is little, if any, public data regarding transactions involving high-profit intangibles.").[7] It follows that Congress

---

[7] Although the 2017 amendment to § 482 has no bearing on our analysis, we note that Congress has not changed its mind:

> The transfer pricing rules of section 482 and the accompanying Treasury regulations are intended to preserve the U.S. tax base by ensuring that taxpayers do not shift income properly attributable to the United States to a related foreign company through pricing that

granted Treasury authority to develop methods that did not rely on analysis of these problematic comparable transactions. Indeed, Treasury echoed Congress's rationale for amending § 482 in the first place when it published the final rule. *Id.* at 51,173 ("The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA.").

What is more, although Altera suggests there can be only one understanding of the methodology required by the arm's length standard, historically the definition of the arm's length standard has been a more fluid one. Indeed, as we have discussed, for most of the twentieth century the arm's length standard explicitly permitted the use of flexible methodology

> does not reflect an arm's-length result. . . . The arm's-length standard is difficult to administer in situations in which no unrelated party market prices exist for transactions between related parties. . . .
>
>   . . . For income from intangible property, section 482 provides "in the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." By requiring inclusion in income of amounts commensurate with the income attributable to the intangible, Congress was responding to concerns regarding the effectiveness of the arm's-length standard with respect to intangible property—including, in particular, high-profit-potential intangibles.

H. REP. NO. 115-466, at 574–75 (2017).

in order to achieve an arm's length *result*. *See also* H.R. REP. NO. 87-2508, at 18–19 (1962) (Conf. Rep.) (noting that, in 1962, Congress stated that Treasury should "provide additional guidelines and formulas" to achieve arm's length results). It is true that, more recently, an understanding that the primary means of reaching an arm's length result suggested the analysis of comparable transactions. But, in the lead-up to the 1986 amendments, Congress voiced numerous concerns regarding reliance on this methodology. Further, as we have discussed, courts for more than half a century have held that a comparable transaction analysis was not the exclusive methodology to be employed under the statute. In light of the historic versatility of methodology, it is reasonable that Treasury would understand that Congress intended for it to depart from analysis of comparable transactions as the exclusive means of achieving an arm's length result.

In addition, Treasury reasonably concluded that doing away with analysis of comparable transactions was an efficient means of ensuring that § 482 would "operat[e] to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles in [QCSAs]." H.R. REP. NO. 99-426, at 423. Congress expressed numerous concerns that pre-1986 allocation methods permitted entities to undervalue their tax liability by placing undue emphasis on "the concept of comparables" and basing allocations on industry norms, rather than on actual economic activity. *Id.* at 424–25. Doing away with analysis of comparable transactions, and instead requiring an internal method of allocation, proves a reasonable method of alleviating these concerns.

In sum, Treasury reasonably understood § 482 as an authorization to require internal allocation methods in the QCSA context, provided that the costs and income allocated are proportionate to the economic activity of the related parties. These internal allocation methods are reasonable methods for reaching the arm's length results required by statute. While interpreting the statute to do away with reliance on comparables may not have been "the only possible interpretation" of Congress's intent, it proves a reasonable one. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Thus, Treasury's interpretation is not "arbitrary, capricious, or manifestly contrary to the statute," and it is therefore permissible under *Chevron*. 467 U.S. at 844.

3

Altera contends that the Commissioner misreads § 482 and its history, arguing that the addition of the commensurate with income standard to § 482 did nothing to change the meaning and operation of the arm's length standard, thus rendering Treasury's interpretation unreasonable. Altera supports its argument with a canon of construction: "Amendments by implication, like repeals by implication, are not favored." *United States v. Welden*, 377 U.S. 95, 103 n.12 (1964). That canon does not apply here. It operates to prevent courts from attributing unspoken motives to legislators, not to force courts to ignore legislative action and express legislative history. In addition, cases invoking the maxim typically refer to a later-enacted, *separate* statute or provision amending a previous statute or provision; most cases do not involve changes to the same statute or

provision.**[8]**  It is illogical to argue that amending a singular statute does not alter its meaning.

Altera's interpretation of the 1986 amendment would render the commensurate with income clause meaningless except in two circumstances:  (1) to allow the Commissioner periodically to adjust prices initially assigned following a comparability analysis; and (2) to reflect a party's contribution of existing intangible property or "buy-in" to a cost-sharing arrangement.  This narrow reading of § 482 is not supported by the text or history of the 1986 amendment.

The Commissioner's allocation of employee stock compensation costs between related parties is necessary for Treasury to fulfill its obligation under § 482.  Congress did not intend to interfere with qualified cost-sharing arrangements when those arrangements provided for the allocation of income consistent with the commensurate with income provision.  H.R. REP. NO. 99-841, at II-638 (Conf. Rep.).

4

Altera makes much of the United States's treaty obligations with other countries, asserting that a purely internal standard is inconsistent with the standards agreed to

---

**[8]** *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 650–52, 664 n.8 (2007) (considering whether a later-enacted provision of the Endangered Species Act could amend a provision of the Clean Water Act); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134 (1974) (considering whether the Rail Act amended a remedy provided by the Tucker Act); *United States v. Dahl*, 314 F.3d 976, 977–78 (9th Cir. 2002) (considering whether a provision codified as a separate note to an existing statute amended the statute).

therein and is therefore unreasonable. However, there is no evidence that our treaty obligations bind us to the analysis of comparable transactions. As demonstrated by nearly a century of interpreting § 482 and its precursor, the arm's length standard is not necessarily confined to one methodology. It reflects neither how related parties behave nor how they are taxed. Moreover, our most recent treaties incorporate not only the arm's length standard, but also the 2003 regulations. *See, e.g.*, U.S. DEP'T OF TREASURY, TECHNICAL EXPLANATION OF THE CONVENTION BETWEEN THE UNITED STATES AND POLAND FOR THE AVOIDANCE OF DOUBLE TAXATION 31 (2013) ("It is understood that the Code section 482 'commensurate with income' standard for determining appropriate transfer prices for intangibles operates consistently with the arm's-length standard. The implementation of this standard in the regulations under Code section 482 is in accordance with the general principles of paragraph 1 of Article 9 of the Convention . . . .").

B

Though Treasury's interpretation of its statutory grant of authority was reasonable, we also must examine whether the procedures used in its promulgation prove defective under the APA. *Catskill Mountains*, 846 F.3d at 522 ("[I]f an interpretive rule was promulgated in a procedurally defective manner, it will be set aside regardless of whether its interpretation of the statute is reasonable."). After reviewing the administrative record, we conclude that Treasury complied with the procedural requirements of the APA and, therefore, the regulations survive *State Farm* scrutiny.

Section 706 of the APA directs courts to "decide all relevant questions of law, interpret constitutional and

statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706 (flush language). Agencies may not act in ways that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). It "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'" *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015) (citing 5 U.S.C. § 553). First, a "[g]eneral notice of proposed rule making" must ordinarily be published in the Federal Register. 5 U.S.C. § 553(b). Second, provided that "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). "An agency must consider and respond to significant comments received during the period for public comment." *Perez*, 135 S. Ct. at 1203. Third, the agency must incorporate in the final rule "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

Altera does not dispute that Treasury satisfied the first step by giving notice of the 2003 regulations. *Id.* Nor does there appear to be a controversy as to whether Treasury included in the final rule "a concise general statement of [its] basis and purpose." *Id.*; 5 U.S.C. § 553. Rather, Altera argues that the regulations fail on the second step, asserting that: (1) Treasury improperly rejected comments submitted in opposition to the proposed rule, (2) Treasury's current litigation position is inconsistent with statements made during the rulemaking process, (3) Treasury did not adequately

support its position that employee stock compensation is a cost, and (4) a more searching review is required under *Fox*, because the agency altered its position. We address each in turn.

1

Under *State Farm*, the touchstone of "arbitrary and capricious" review under the APA is "reasoned decisionmaking." *State Farm*, 463 U.S. at 52. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quoting *State Farm*, 463 U.S. at 43). However, we may not set aside agency action simply because the rulemaking process could have been improved; rather, we must determine whether the agency's "path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

In considering and responding to comments, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines*, 371 U.S. at 168). "[A]n agency need only respond to 'significant' comments, *i.e.*, those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (quoting *Home Box Office v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977) (per

curiam)).  If the comments ignored by the agency would not bear on the agency's "consideration of the relevant factors," we may not reverse the agency's decision.  *Id.*

Treasury published its notice of proposed rulemaking in 2002.    Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. 48,997-01.   In its notice, Treasury made clear that it was relying on the commensurate with income provision.  *Id.* at 48,998.  To support its position, Treasury drew from the legislative history of the 1986 amendment, explaining that Congress intended a party to a QCSA to "bear its portion of all research and development costs."  *Id.* (quoting H.R. REP. NO. 99-841, at II-638 (Conf. Rep.).   It also informed interested parties of its intent to coordinate the new regulations with the arm's length standard, suggesting that it was attempting to synthesize the potentially disparate standards found within § 482 itself.  *Id.* at 48,998, 49,000–01.

Commenters responded by attacking the proposed regulations as inconsistent with the traditional arm's length standard because the methodology did not involve analysis of comparable transactions.   To support their position, they primarily discussed arm's length agreements in which unrelated parties did not mention employee stock options. They explained that unrelated parties do not share stock compensation costs because it is difficult to value stock-based compensation, and there can be a great deal of expense and risk involved.

In the preamble to the final rule, Treasury dismissed the comments (and, relatedly, the behavior of controlled taxpayers):

Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account for purposes of QCSAs is consistent with the legislative intent underlying section 482 and with the arm's length standard (and therefore with the obligations of the United States under its income tax treaties . . .). The legislative history of the Tax Reform Act of 1986 expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent with the arm's length standard, if and to the extent that the participants' shares of income "reasonably reflect the actual economic activity undertaken by each." *See* H.R. CONF. REP. NO. 99-481, at II-638 (1986). . . . [I]n order for a QCSA to reach an arm's length result consistent with legislative intent, the QCSA must reflect all relevant costs, including such critical elements of cost as the cost of compensating employees for providing services related to the development of the intangibles pursuant to the QCSA. Treasury and the IRS do not believe that there is any basis for distinguishing between stock-based compensation and other forms of compensation in this context.

Treasury and the IRS do not agree with the comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's

length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances. . . . The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA.

Compensatory Stock Options under Section 482 (Preamble to Final Rule), 68 Fed. Reg. 51,171-02, 51,172–73 (Aug. 26, 2003).

Treasury added:

Treasury and the IRS believe that if a significant element of [the costs shared by unrelated parties] consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation.

*Id.* at 51,173.

By submitting the cited transactions between unrelated parties, the commentators apparently assumed that Treasury would employ analysis of comparable transactions. This assumption, however, overlooks Treasury's decision to do away with analysis of comparable transactions in the first place—a decision that was made clear enough by citations to

legislative history in the notice of proposed rulemaking and in the preamble to the final rule. As discussed in our *Chevron* analysis, Treasury's conclusion that it could require parties to a QCSA to share all costs was a reasonable one. Thus, "significant" comments that required a response would have spoken to why this interpretation was not, in fact, reasonable, so that adopting the comments would require Treasury to change the regulation. *Am. Mining Congress*, 965 F.2d at 771. As an example, Treasury would have been required to respond to comments demonstrating that doing away with analysis of comparables did not, in fact, serve the purposes of parity set out in the statute.

Indeed, the cited transactions actually reinforced the original justification for adopting a purely internal methodology—the lack of transactions comparable to those occurring between parties to a QCSA. Specifically, as Treasury remarked, the submitted transactions did not "share enough characteristics of QCSAs involving the development of high-profit intangibles" to provide grounds for accurate comparison. Because of this lack of similar transactions, Treasury justifiably chose to employ methodology that did not depend on non-existent comparables to satisfy the commensurate with income test and achieve tax parity. In this way, the comments reinforced Treasury's premise for adopting the purely internal methodology, but were irrelevant to the underlying choice of methodology. Treasury did not err in refusing to examine them more rigorously.

In sum, we cannot find a failure in Treasury's refusal to consider comments that proved irrelevant to its decisionmaking process. Here, Treasury gave sufficient notice of what it intended to do and why, and the submitted comments were irrelevant to the issues Treasury was

considering.   Because the comments had no bearing on
"relevant factors" to the rulemaking, nor any bearing on the
final rule, there was no APA violation.   *Am. Mining
Congress*, 965 F.2d at 771.

2

Treasury's current litigation position is not inconsistent
with the statements it made to support the 2003 regulations at
the time of the rulemaking.  Altera argues that its position is
justified by *SEC v. Chenery Corp.*, 332 U.S. 194 (1947).
"[A] reviewing court . . . must judge the propriety of [agency]
action solely by the grounds invoked by the agency."  *Id.* at
196.  "If those grounds are inadequate or improper, the court
is powerless to affirm the administrative action by
substituting what it considers to be a more adequate or proper
basis."  *Id.*

Altera argues that the Commissioner cannot now claim
that "Treasury reasonably determined that it was statutorily
authorized to dispense with comparability analysis" because
"[n]owhere in the regulatory history did the Secretary suggest
that he 'was statutorily authorized to dispense with
comparability analysis.'"  But these arguments misunderstand
the rulemaking requirements imposed by *Chenery*.  *Chenery*
does not require us to adopt Altera's position as to how the
arm's length standard operates.  Instead, we must "defer to an
interpretation which was a necessary presupposition of [the
agency's] decision," if reasonable, even when alternative
interpretations are available.  *Nat'l R.R. Passenger Corp. v.
Boston & Maine Corp.*, 503 U.S. 407, 419–20 (1992).

Treasury reasonably interpreted congressional intent in
the 1986 amendments as permitting it to dispense with a

comparable transaction analysis in the absence of actual comparable transactions. Its interpretation was all the more reasonable given, as we have discussed, that the arm's length standard has historically been understood as more fluid than Altera suggests. Because *Chenery* does not require agencies to provide "exhaustive, contemporaneous legal arguments to preemptively defend its action," its references to the 1986 amendments provide an adequate ground for its determination. *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 515 (4th Cir. 2011).

Altera contends further that the Commissioner's position is incompatible with Treasury's statements during the rulemaking process, when the Secretary claimed that the cost-sharing regulations were consistent with the arm's length standard (as well as the commensurate with income standard). This argument misinterprets Treasury's position. Treasury asserted then, and still asserts in this litigation, that using an internal method of reallocation is consistent with the arm's length standard because it attempts to bring parity to the tax treatment of controlled and uncontrolled taxpayers, as does comparison of comparable transactions when they exist. Treasury's position was also consistent with its White Paper,[9] and Treasury's interpretation in the 1994 regulation of the arm's length standard as result-oriented, rather than method-oriented, with the goal of achieving tax parity. 26 C.F.R. § 1.482-1(b)(1) (1994).

---

[9] Altera argues that a passage in the White Paper, in which Treasury wrote that "intangible income must be allocated on the basis of comparable transactions if comparables exist," demonstrates inconsistency. However, that statement is entirely consistent with Treasury's view that a different methodology must be applied when comparable transactions do *not* exist.

Altera's argument is founded on its belief that an arm's length analysis always must be method-oriented, and rooted in actual transactional analysis. But the question before us is not which view is superior; it is whether Treasury's position in 2003 was incompatible with its prior position in promulgating the 1994 and 1995 regulations. As we have discussed, it was clear in 1994 and 1995 that, in implementing the commensurate with income amendment, Treasury was moving away from a purely method-based, comparable-transaction view of the arm's length standard in attempting to achieve tax parity. Treasury's citation to the amendment, and its legislative history, demonstrates that its position was not inconsistent, and there is no basis under *Chenery* to invalidate it.

3

Altera also argues that Treasury did not adequately support its position that employee stock compensation is a cost, asserting that Treasury wrongfully ignored evidence that companies do not factor stock-based compensation into their pricing decisions. As an accounting matter in the past, this issue may have been disputed. Indeed, at one point, "[t]he debate on accounting for stock-based compensation . . . became so divisive that it threatened the [Financial Accounting Standards] Board's future working relationship with some of its constituents." FINANCIAL ACCOUNTING STANDARDS BOARD, FINANCIAL ACCOUNTING FOUNDATION, ACCOUNTING FOR STOCK-BASED COMPENSATION: STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 123, at 25 (1995). However, as we will discuss, it is uncontroversial today. Since 1995, the Financial Accounting Standards Board has supported treating stock options as costs. *Id.*

Treasury's rulemaking process was sufficient. Treasury articulated why treating stock-based compensation as a cost led to arm's length results. It first noted that stock-based compensation is a "critical element" of R&D costs for parties to a QCSA and noted that such compensation is "clearly related to the intangible development area." Compensatory Stock Options Under Section 482 (Preamble to Final Rule), 68 Fed. Reg. at 51,173. Logic supports these conclusions. Parties dealing at arm's length, as Treasury explained, would not "ignore" stock-based compensation if such compensation were a "significant element" of the compensation costs one party incurs and another party agrees to reimburse when developing high-profit intangibles. *Id*. Rather, "through bargaining," each party would ensure that the cost-sharing agreement is in its best interest, meaning that the parties will consider the internal costs of stock compensation without requiring the other party to recognize those costs. *Id.*

Though commentators presented evidence of some transactions in which stock-based compensation was not a cost, this evidence provided little guidance because it did not concern parties to a QCSA developing high-profit intangibles. This out-of-context data did not require a different decision. In the absence of applicable evidence, Treasury's analysis provides a logical explanation of how treating stock-based compensation as a cost leads to arm's length results.

In addition, as we have noted, generally accepted accounting principles supported Treasury's conclusion, and Treasury cited generally to "tax and other accounting principles" for its determination that there is a "cost associated with stock-based compensation." Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,999. One such principle is that a distinction exists

between the economic costs of stock compensation—which are debatable—versus the accounting costs—which are not. Because entities account for the cost of providing employee stock options, it is reasonable for Treasury to allocate that cost. In light of these fundamental understandings, Treasury's reference to "tax and other accounting principles" provides a solid foundation for the Commissioner's interpretation.[10]

Most notably, the Tax Code classifies stock-based compensation as a trade or business "expense." 26 U.S.C. § 162(a). And the challenged regulation cites the provision providing that this expense is a deductible expense. 26 C.F.R. § 1.482-7A(d)(2)(iii)(A) ("[T]he operating expense attributable to stock-based compensation is equal to the amount allowable . . . as a deduction for Federal income tax purposes . . . (for example, under [26 U.S.C. § 83(h)])."). The reference to the Tax Code's classifications in the regulation itself serves as yet another articulation of Treasury's reasoning, the reasonableness of which is made clear by the Tax Code's treatment of stock-based compensation as a cost.

Though it could have been more specific, Treasury "articulated a rational connection" between its decision and these industry standards. *County of Amador v. U.S. Dep't of Interior*, 872 F.3d 1012, 1027 (9th Cir. 2017) (internal

---

[10] *See, e.g.*, Andrew Barry, *How Much Do Silicon Valley Firms Really Earn?*, BARRON'S (June 27, 2015), http://www.barrons.com/articles/how-much-do-silicon-valley-firms-really-earn-1435372718)) (noting that numerous companies, including Google and Qualcomm, reported stock compensation "total[ling] five percent or more of revenue in recent years").

quotation marks omitted), *cert. denied*, 139 S. Ct. 64 (2018). Presuming that Treasury was authorized to dispense with a comparability analysis, making the economic behavior of uncontrolled taxpayers irrelevant, Altera does not offer any compelling argument against the reasonableness of Treasury's determination.

4

Finally, in addition to its general *State Farm* argument, Altera asks for a more searching review under *Fox*. Altera claims that the cost-sharing amendments present a major shift in administrative policy such that Treasury could not issue the regulations without carefully considering and broadcasting its decision. Altera argues that "[t]he assertion that the commensurate with income clause supplants the arm's-length standard with a 'purely internal' analysis is a sharp—but unacknowledged—reversal from Treasury's long-standing prior policy."

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Indeed, "[w]hen an agency changes its existing position, it 'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Id.* at 2125–26 (quoting *Fox*, 556 U.S. at 515). However, an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox*, 556 U.S. at 515.

> [A] policy change complies with the APA if
> the agency

(1) displays "awareness that it is changing position,"

(2) shows that "the new policy is permissible under the statute,"

(3) "believes" the new policy is better, and

(4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (format altered) (quoting *Fox*, 556 U.S. at 515–16).

At its core, this argument is not meaningfully different from Altera's general APA argument. If the arm's length standard allows the Commissioner to allocate costs between related parties without a comparability analysis, there is no policy change, merely a clarification of the same policy. Further, as we have discussed, the policy change was occasioned by the congressional addition of the "commensurate with income" sentence in the Tax Reform Act of 1984 and the 1994 and 1995 implementing regulations. Those changes occurred well before 2003. The 2003 regulations clarified, rather than altered, prior policy. And the enactment of a statutory amendment obviously makes a concomitant regulatory amendment appropriate.

5

Thus, the 2003 regulations are not arbitrary and capricious under the standard of review imposed by the APA. Treasury's regulatory path may be reasonably discerned. Treasury understood § 482 to authorize it to employ a purely internal, commensurate with income approach in dealing with related companies. It provided adequate notice of its intent and adequately considered the objections. Its conclusion that stock based compensation should be treated as a cost was adequately supported in the record, and its position did not represent a policy change under *Fox*.

C

Altera also argues that the outcome of this case is controlled by our court's decision in *Xilinx.* We disagree. Although the *Xilinx* panel could have reached a holding that would foreclose the Commissioner's current position, it did not.

In *Xilinx*, we considered the 1994 and 1995 cost-sharing regulations. The case involved a matter of regulatory interpretation, not executive authority. Xilinx, Inc., another maker of programmable logic devices, challenged the Commissioner's allocation of employee stock options between Xilinx and its Irish subsidiary. 598 F.3d at 1192. As framed by the panel, the issue was whether § 1.482-1 (1994)—which sets forth the arm's length standard—could be reconciled with § 1.482-7(d)(1) (1995)—under which parties to a QCSA were required to share "all . . . costs" incurred in developing intangibles. *Id.* at 1195.

*Xilinx* does not govern here.  First, the parties in *Xilinx* were not debating administrative authority, and we did not consider the "commensurate with income" standard, which Congress itself did not see as inconsistent with the arm's length standard.  Second, and more significantly, the *Xilinx* panel was faced with a conflict between two rules.  If the rules were conceptually distinguishable, they were also in direct conflict.  The arm's length rule, § 1.482-1(b)(1) (1994), listed specific methods for calculating an arm's length result. The all-costs provision was not one of those methods, as the first *Xilinx* majority noted.  567 F.3d at 491.  Treasury issued the coordinating amendment in 2003, *after* the tax years at issue in *Xilinx*, and the arm's length regulation now expressly references the cost-sharing provision that Altera challenges. The *Xilinx* panel did not address the "open question" of whether the 2003 regulations remedied the error identified in that decision.  598 F.3d at 1198 n.4 (Fisher, J., concurring). Today, there is no conflict in the regulations, and Altera does not challenge the regulations on the ground that a conflict exists.

*Xilinx* did not involve the question of statutory interpretation, the Commissioner's authority, or the regulation at issue in this appeal:  26 C.F.R. § 1.482-7A(d)(2).  Accordingly, it does not assist Altera.

IV

The 1986 amendment focused specifically on intangibles, and it gave Treasury the ability to respond to rapid changes in the high tech industry.  "The broad language of [§ 482] reflects an intentional effort to confer the flexibility necessary to forestall . . . obsolescence."  *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007).  In the modern economy, employee

stock options are integral to R&D arrangements.  In fact, in Altera's 2015 annual report, its stock-based compensation cost equaled nearly five percent of total revenue.  ALTERA CORP., ANNUAL REPORT FOR THE FISCAL YEAR ENDED DEC. 31, 2014 (FORM 10-K).    Simply speaking, the rise in employee stock compensation is an economic development that Treasury cannot ignore without rejecting its obligations under § 482.

In sum, we disagree with the Tax Court that the 2003 regulations are arbitrary and capricious under the standard of review imposed by the APA.  While the rulemaking process was less than ideal, the APA does not require perfection.  We are able to reasonably discern Treasury's path—Treasury understood § 482 to authorize it to employ a purely internal, commensurate with income approach where comparable transactions are not comparable.

In light of the statute's plain text and the legislative history, Treasury also reasonably concluded that Congress intended to hone the definition of the arm's length standard so that it could work to achieve an arm's length *result*, instead of forcing application of a particular comparability *method*. Given the long history of the application of other methods, and the text and legislative history of the Tax Reform Act of 1984, Treasury's understanding of its power to use methodologies other than a pure transactional comparability analysis was reasonable, and we defer to its interpretation under *Chevron*.    The Commissioner did not exceed the authority delegated to him by Congress in issuing the regulations.

**REVERSED.**

O'MALLEY, Circuit Judge, dissenting:

"[T]he foundational principle of administrative law [is] that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) (citing *SEC v. Chenery Corp.* ("*Chenery I*"), 318 U.S. 80, 87 (1943)).   Prior to promulgating Treas. Reg. § 1.482-7A(d)(2), whose validity we consider here, Treasury repeatedly recognized that 26 U.S.C. § 482 requires application of an arm's length standard when determining the true taxable income of a controlled taxpayer—i.e., it requires Treasury to assess what a taxpayer dealing with an uncontrolled taxpayer would do in the same circumstances.   And, Treasury just as consistently asserted that a comparability analysis is the only way to determine the arm's length standard; indeed, Treasury made clear that a comparability analysis is the cornerstone of the arm's length standard.   Despite these consistent practices and declarations, in its preamble to § 1.482-7A(d)(2), Treasury stated, for the first time and with no explanation, that it may, *instead*, employ the "commensurate with income" standard to reach the required arm's length result.

Today, the majority justifies Treasury's about-face in three steps:   (1) it finds that, by citing to the legislative history surrounding the enactment of the Tax Reform Act of 1986 in the preamble to § 1.482-7A(d)(2), Treasury implicitly communicated its understanding that Congress "permitt[ed] it to dispense with a comparable transaction analysis," Op. 40–41; (2) it finds that, by including that same cryptic citation to legislative history in its proposed notice of rulemaking, Treasury made it "clear enough" to interested parties that Treasury was changing its longstanding practice of applying a comparability analysis, Op. 38–39; and (3) it

justifies Treasury's resort to the commensurate with income standard by invoking the second sentence of § 482 to conclude that Treasury may jettison the arm's length standard altogether—a justification Treasury never provided and one which does not withstand careful scrutiny.

The majority, thus, "suppl[ies] a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.* ("*Chenery II*"), 332 U.S. 194, 196 (1947)), encourages "executive agencies' penchant for changing their views about the law's meaning almost as often as they change administrations," *BNSF Ry. Co. v. Loos*, 586 U.S. ___, No. 17-1042, slip op. at 9 (2019) (Gorsuch, J., dissenting), and endorses a practice of requiring interested parties to engage in a scavenger hunt to understand an agency's rulemaking proposals.  That practice is inconsistent with another fundamental Administrative Procedure Act ("APA") principle: that a notice of proposed rulemaking "should be sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticism and comments." *Am. Mining Cong. v. U.S. EPA*, 965 F.2d 759, 770 (9th Cir. 1992) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 48 (D.C. Cir. 1976) (en banc)).  In so doing, the majority stretches "highly deferential" review, *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)), beyond its breaking point.

I would instead find, as the Tax Court did, that Treasury's explanation of its rule (to the extent any was provided) failed to satisfy the *State Farm* standard, that Treasury did not provide adequate notice of its intent to change its

longstanding practice of employing the arm's length standard and using a comparability analysis to get there, and that its new rule is invalid as arbitrary and capricious. I would also hold that this court's previous decision in *Xilinx, Inc. v. Commissioner of Internal Revenue* ("*Xilinx II*"), 598 F.3d 1191 (9th Cir. 2010), controls and mandates an order affirming the Tax Court's decision. I therefore would affirm the judgment of the Tax Court that expenses related to stock-based compensation are not among the costs to be shared in qualified cost sharing arrangements ("QCSAs") under Treas. Reg. § 1.482-7(d)(1) (as amended in 2013). *See Altera Corp. v. Comm'r*, 145 T.C. 91, 92 (2015). For these reasons, I respectfully dissent.

## I. BACKGROUND

### A. The Arm's Length Standard

### 1. Before 1986

"The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." *Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972) (quoting Treas. Reg. § 1.482-1(b)(1) (1971)). The "touchstone" of this tax parity inquiry is the arm's length standard. *Xilinx II*, 598 F.3d at 1198 n.1 (Fisher, J., concurring). Indeed, the first sentence of § 482 states that, "[i]n any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests, the Secretary may . . . allocate gross income . . . if he determines that such . . . allocation is necessary in order to prevent evasion of

taxes or clearly to reflect the income of any of such organizations, trades, or businesses." This sentence has always been viewed as requiring an arm's length standard. *See First Sec. Bank of Utah*, 405 U.S. at 400; *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 305 (1994).

Since the 1930s, Treasury regulations consistently have explained that, "[i]n determining the true taxable income of a controlled taxpayer, the standard to be applied *in every case* is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(b)(1) (2003) (emphasis added). That is, income and deductions are to be allocated among related companies in the same way that unrelated companies negotiating at arm's length would allocate income and deductions. As far back as 1968, Treasury's regulations also required that, "[i]n order for the sharing of costs and risks to be considered on an arm's length basis, the terms and conditions *must be comparable* to those which would have been adopted by unrelated parties similarly situated had they entered into such an arrangement." Allocation of Income and Deductions Among Taxpayers, 33 Fed. Reg. 5848, 5854 (April 16, 1968) (emphasis added). That same regulation provided that Treasury may not allocate income with respect to QCSAs involving the development of intangible property unless doing so would be consistent with the arm's length standard. *Id.* (providing that, in "a bona fide cost sharing arrangement with respect to the development of intangible property, the district director shall not make allocations with respect to such acquisition except as may be appropriate to reflect each participant's arm's length share of the costs and risks of developing the property."). Therefore, at the time Congress enacted the 1986 amendment, Treasury's own regulations explicitly required a determination of what an arm's length result would show *and*

required a comparability analysis to reach that result where comparable transactions exist.

The majority attempts to water down the text of Treasury's own regulations at the time. It contends that, "[a]lthough the Secretary adopted the arm's length standard, courts did not hold related parties to the standard by exclusively requiring the examination of comparable transactions." Op. 9. To support its position, the majority cites this court's decision in *Frank v. Int'l Canadian Corp.*, 308 F.2d 520, 528–29 (9th Cir. 1962), which disagreed that "'arm's length bargaining' is the sole criterion for applying the statutory language of [§ 482] in determining what the 'true net income' is of each 'controlled taxpayer.'" But, in *Oil Base, Inc. v. Commissioner of Internal Revenue*, 362 F.2d 212, 214 n.5 (9th Cir. 1966), this court clarified that the holding in *Frank* was an outlier, limited only to the peculiar facts of that case. *Frank*'s departure from the arm's length analysis, the court held, was justified, in part, because "there was no evidence that arm's-length bargaining upon the specific commodities sold had produced a higher return" and because "the complexity of the circumstances surrounding the services rendered by the subsidiary" made it "difficult for the court to hypothesize an arm's-length transaction." *Id.* Significantly, the parties in *Frank* had stipulated to applying a standard other than the arm's length standard. *Id.*

There really can be no doubt that, prior to the 1986 amendment, this Circuit believed that an arm's length standard based on comparable transactions was the sole basis for allocating costs and income under the statute in all but the narrow circumstances outlined in *Frank*—including the presence of the stipulation therein. The majority's attempt to breathe life back into *Frank* is, simply, unpersuasive.

## 2. The 1986 Amendment

The 1986 amendment passed against the backdrop of Treasury's own longstanding practices did not change the obligation to employ an arm's length standard. Indeed, Congress left the first sentence of § 482—the sentence that undisputedly incorporates the arm's length standard—intact. It merely added a second sentence providing that, "[i]n the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2562 (1986) (codified as amended at 26 U.S.C. § 482). The plain text of the statute limits the application of the commensurate with income standard to only *transfers* or *licenses* of intangible property.

This is consistent with the underlying purpose of the 1986 amendment. Congress explained in the committee report that it was introducing the commensurate with income standard to address a "recurrent problem" with transfers of highly valuable intangible property: "the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables." H.R. REP. NO. 99-426, at 423–24 (1985). Congress noted that "[i]ndustry norms for transfers to unrelated parties of less profitable intangibles frequently are not realistic comparables in these cases," and that "[t]here are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable." *Id.* at 424–25. To address this *specific* gap, Congress found it "appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation . . . be commensurate with the income

attributable to the intangible." *Id.* at 425. Congress did not make any other findings regarding the use of the commensurate with income standard for any transactions other than transfers or licenses of intangible property. Thus, the statute—read in light of this legislative history—did not grant Treasury the flexibility to depart from a comparability analysis whenever it sees fit; rather, it permitted a departure in the limited context of "any transfer (or license) of intangible property" because it had found that comparable transactions in such cases are frequently unrealistic.

Treasury reiterated the limited circumstances in which the commensurate with income standard applies in its 1988 "White Paper." It stated there that, even in the context of transfers or licenses of intangible property, the "intangible income must be allocated on the basis of comparable transactions if comparables exist." *A Study of Intercompany Pricing under Section 482 of the Code* ("White Paper"), I.R.S. Notice 88-123, 1988-1 C.B. 458, 474; *see also id.* at 473 (noting that, where "there is a true comparable for" the licensing of a "high profit potential intangible," the royalty rate for the license "must be set on the basis of the comparable because that remains the best measure of how third parties would allocate intangible income"). Only "in situations in which comparables do not exist" for transfers of intangible property would the commensurate with income standard apply. *Id.* at 474. Indeed, the United States continued to insist in tax treaties, and in documents that Treasury issued to explain these treaties, that § 482 mandated the arm's length principle, in all but this narrow category of intangible transfers. *See Xilinx II*, 598 F.3d at 1196–97 (citing tax treaty explanations); *see also id.* at 1198 n.1 (Fisher, J., concurring) (noting that "the 1997 United States–Ireland Tax Treaty, . . . and others like it, reinforce the

arm's length standard as Congress' intended touchstone for § 482").[1]

## B. Treatment of Stock-Based Compensation

In the early 1990s, related companies began to compensate certain employees who performed research and development activities pursuant to QCSAs by granting stock options and other stock-based compensation. *See id.* at 1192–93. This manner of compensation allowed companies to avoid the income reallocation mechanisms available under § 482 by including only the employees' cash compensation in the cost pool under the agreement, but not their stock-based compensation.

To address this loophole, Treasury promulgated new regulations governing the tax treatment of controlled transactions in 1994 and 1995. These regulations affirmed that "the standard to be applied in every case" was the arm's length standard and that "an arm's length result generally will be determined by reference to the results of comparable transactions" because "identical transactions can rarely be located." Treas. Reg. § 1.482-1(b)(1) (as amended in 1994). They also provided that intangible development costs included "all of the costs incurred by . . . [an uncontrolled] participant related to the intangible development area."

---

[1] As the majority observes, more recent tax treaty explanations have also cited the alternative commensurate with income standard. Op. 32–33 (citing Technical Explanation of the US-Poland Tax Treaty, at 31 (Feb. 13, 2013)). Even these explanations, however, emphasize the primacy of the arm's length standard, and they assure the reader that the commensurate with income standard "operates consistently with the arm's-length standard." Technical Explanation of the US-Poland Tax Treaty, at 30–31 (Feb. 13, 2013).

Treas. Reg. § 1.482-7(d)(1) (as amended in 1995). The IRS interpreted this latter "all costs" provision to include stock-based compensation, so that related companies in cost-sharing agreements would have to share costs of providing such compensation. *Xilinx II*, 598 F.3d at 1193–94.

When Xilinx, Inc. ("Xilinx") challenged the IRS's interpretation, the Tax Court decided that the agency's interpretation was inconsistent with Treas. Reg. § 1.482-1 because the IRS had not adduced evidence sufficient to show that unrelated parties transacting at arm's length would, in fact, share expenses related to stock-based compensation. *Xilinx v. Commissioner* ("*Xilinx I*"), 125 T.C. 37, 53 (2005). The Commissioner did not appeal this underlying factual finding and, instead, argued on appeal to this court that Treas. Reg. § 1.482-7 superseded the arm's length requirement of Treas. Reg. § 1.482-1. All three members of the divided panel therefore assumed that sharing expenses related to stock-based compensation would be inconsistent with the arm's length standard. *Xilinx II*, 598 F.3d at 1194 ("The Commissioner does not dispute the tax court's factual finding that unrelated parties would not share [employee stock options] as a cost."); *id.* at 1199 (Reinhardt, J., dissenting) (assuming that the Tax Court "correctly resolved" the issue of whether sharing stock-based compensation costs would constitute an arm's length result). The panel also assumed that Treas. Reg. § 1.482-7 required stock-based compensation expenses to be shared. *Id.* at 1196 (majority opinion) (noting that the "all costs" provision "does not permit any exceptions, even for costs that unrelated parties would not share"); *id.* at 1199 (Reinhardt, J., dissenting) (assuming that the "all costs" provision includes "employee stock option costs"). But a majority of the panel ultimately held that the arm's length standard, which it described as the fundamental

"purpose" of the regulations, trumped Treas. Reg. § 1.482-7, and that stock-based compensation expenses could not be shared in the absence of evidence that unrelated parties would share such costs. *Id.* at 1196 (majority opinion); *see also id.* at 1198 n.1 (Fisher, J., concurring) (finding "the arm's length standard" to be "Congress' intended touchstone for § 482"). On that ground, this court affirmed the Tax Court's judgment in favor of Xilinx. *Id.* at 1196 (majority opinion).

## C. The Regulations at Issue

While *Xilinx II* was pending before this court, Treasury promulgated the regulations at issue here. Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171, 51,172 (Aug. 26, 2003) (codified at 26 C.F.R. pts. 1 and 602). The amended regulations sought to reconcile the apparent contradiction between the arm's length standard in Treas. Reg. § 1.482-1 and the requirement that stock-based compensation expenses be shared under Treas. Reg. § 1.482-7. The former provision now specifies that § 1.482-7 "provides the specific methods to be used to evaluate whether a [QCSA] produces results consistent with an arm's length result." Treas. Reg. § 1.482-1(b)(2)(i) (2003). And § 1.482-7, in turn, now provides that a QCSA produces an arm's length result "if, and only if," the participants share all of the costs of intangible development—explicitly including costs associated with stock-based compensation—in proportion to their shares of reasonably anticipated benefits attributable to such development. Treas. Reg. § 1.482-7(d)(2) (2003).

Altera Corp. ("Altera U.S."), a Delaware corporation, and its subsidiary Altera International, a Cayman Islands corporation, (collectively "Altera") entered into a technology

research and development cost-sharing agreement under which the related participants "agreed to pool their respective resources to conduct research and development using the pre-cost-sharing intangible property" and "to share the risks and costs of research and development activities they performed on or after May 23, 1997." *Altera*, 145 T.C. at 93. This agreement was effective from May 23, 1997 through 2007. *Id.* During the 2004–2007 taxable years, Altera U.S. granted stock options and other stock-based compensation to certain employees who performed research and development activities pursuant to the agreement. *Id.* The employees' cash compensation was included in the cost pool under the agreement, but their stock-based compensation was not. *Id*.

Altera timely filed an income tax return for its 2004–2007 taxable years. *Id.* at 94. Treasury responded by mailing notices of deficiency for those years, allocating income from Altera International to Altera U.S. by increasing Altera International's cost-sharing payments. *Id.* Treasury claimed its cost-sharing adjustments were for the purpose of bringing Altera in compliance with § 1.482-7(d)(2), now § 1.482-7A(d)(2). *Id.* Altera challenged the validity of § 1.482-7A(d)(2) in Tax Court, arguing that the new rule is arbitrary and capricious. *Id.* at 92. The Tax Court unanimously held, as discussed in more detail below, that the explanation Treasury offered in the preamble accompanying the new regulations was insufficient to justify those regulations under *State Farm*. *Id.* at 120–33. The Commissioner appeals that decision.

## II. Discussion

The Tax Court considered and rejected Treasury's plainly stated explanation for its regulation—that Treasury applied

the commensurate with income test because it could find no transactions comparable to the QCSAs at issue and that Treasury's analysis was actually *consistent* with the arm's length standard. The Commissioner now argues on appeal, however—and the majority accepts its new claim—that what Treasury was *actually* saying is that § 482 no longer requires a comparability analysis when Treasury concludes that any comparable transactions are imperfect and that the methodology for arriving at an arm's length result is, and always has been, fluid. I disagree. Specifically, as explained below, I believe that: (1) Treasury's rule is procedurally invalid and the majority's attempt to recreate the record surrounding its adoption cannot cure that flaw; (2) Treasury's purported interpretation of § 482 is wrong; and (3) related companies may not be required to share the cost of stock-based compensation under current law because comparable uncontrolled taxpayers would not do so.

## A.  The New Rule is Procedurally Invalid

Under the Administrative Procedure Act, we must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review of an agency regulation is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (quoting *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). But "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). For that reason, "[w]e may not supply a reasoned basis for the agency's action

that the agency itself has not given."  *Id.* at 43 (quoting *Chenery II*, 332 U.S. at 196).

I start, therefore, with what Treasury said when it promulgated the regulation at issue.  In Treasury's notice of proposed rulemaking, the agency explained the origins of the commensurate with income standard and discussed the White Paper.  Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997, 48,998 (proposed July 29, 2002) (to be codified at 26 C.F.R. pt. 1).  Treasury noted, in particular, the White Paper's observation "that Congress intended that Treasury and the IRS apply and interpret the commensurate with income standard consistently with the arm's length standard."  *Id.* (citing White Paper, 1988-1 C.B. at 458, 477).

Treasury then detailed how the proposed rules would function, including that the new rules required stock-based compensation costs to be included among the costs shared in a QCSA to produce "results consistent with an arm's length result."  *Id.* at 49,000–01.  It acknowledged that "[t]he Tax Reform Act of 1986 . . . amended section 482 to require that consideration for intangible property *transferred* in a controlled transaction be commensurate with the income attributable to the intangible" property.  *Id.* at 48,998 (emphasis added).  But it then conclusively stated, based on a vague reference to the "legislative history of the Act," that parties may continue to enter into bona fide *research and development* cost sharing arrangements so long as "the income allocated among the parties reasonably reflect actual economic activity undertaken by each"—i.e., so long as these agreements to develop intangible property survive the commensurate with income standard. *Id.* (emphasis added). Not once did Treasury justify its application of the commensurate with income standard by stating that QCSAs

of this kind constitute "transfers" of intangible property under the Tax Reform Act. And, while it generally cited to the legislative history of the 1986 amendments to § 482—a fact on which the majority places great weight—it did not explain what portions of the legislative history it found pertinent or how any of that history factored into its thinking.

Treasury expanded on its reasoning in the preamble to the final rule. It explained that the tax treatment of stock-based compensation in QCSAs would have to be consistent "with the arm's length standard (and therefore with the obligations of the United States under its income tax treaties and with the OECD transfer pricing guidelines)." 68 Fed. Reg. at 51,172. Treasury observed, however, that the legislative history of the 1986 amendment to § 482 "expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent with the arm's length standard, if and to the extent that participants' shares of income 'reasonably reflect the actual economic activity undertaken by each.'" *Id.* (quoting H.R. REP. NO. 99-481, at II-638 (1986) (Conf. Rep.)). Again, Treasury never explained why QCSAs in which controlled parties share costs to develop intangibles would constitute "transfers" of intangibles sufficient to trigger the commensurate with income standard in the first place. Instead, it simply declared that, "in order for a QCSA to reach an arm's length result consistent with legislative intent," the QCSA must include stock-based compensation among the costs shared. *Id.*

Throughout the preamble, Treasury repeatedly emphasized that it was continuing to apply the arm's length standard. Treasury explained, for example, that "[t]he regulations relating to QCSAs *have as their focus* reaching

results consistent with what parties at arm's length generally would do if they entered into cost sharing arrangements for the development of high-profit intangibles." *Id.* (emphasis added). Treasury determined that "[p]arties *dealing at arm's length* in [a cost-sharing] arrangement based on the sharing of costs and benefits generally would not distinguish between stock-based compensation and other forms of compensation." *Id.* (emphasis added). And Treasury concluded that "[t]he final regulations provide that stock-based compensation must be taken into account in the context of QCSAs *because* such a result is consistent with the arm's length standard." *Id.* (emphasis added).

Yet, Treasury failed to consider comparable transactions submitted by commentators demonstrating that unrelated companies would never share the cost of stock-based compensation. Treasury responded to these comments invoking the arm's length standard. *See id.* (rejecting "comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances"). Treasury acknowledged that these comparable arm's-length transactions are typically relevant, but it determined that there were no comparable transactions available for QCSAs for the development of high-profit intangibles:

> While the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard, in the case of QCSAs such data may not be available. As

recognized in the legislative history of the Tax Reform Act of 1986, there is little, if any, public data regarding transactions involving high-profit intangibles. The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA.

*Id.* at 51,172–73 (internal citation omitted).

The Tax Court held that Treasury's explanation for its regulation was insufficient under *State Farm*. *Altera*, 145 T.C. at 120–33. It found that Treasury "failed to provide a reasoned basis" for its "belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs." *Id.* at 123. The court acknowledged that agencies need not gather empirical evidence for *some* policy-based propositions, but it held that "the belief that unrelated parties would share stock-based compensation costs in the context of a QCSA" was not such a proposition. *Id.* In reaching this conclusion, the court observed that commentators submitted significant evidence during the rulemaking process indicating that unrelated parties would not share stock-based compensation costs in QCSAs; that the Tax Court itself had made a factual determination on that issue in *Xilinx I*—concluding they would not; and, that Treasury was required at least to attempt to gather empirical evidence before declaring that no such evidence was available. *Id.* at 123–24.

The Tax Court then detailed why Treasury's explanation for the regulations was insufficient. The court noted that only some QCSAs involved high-profit intangibles or included stock-based compensation as a significant element of compensation, yet Treasury failed to distinguish between QCSAs with and without those characteristics. *Id.* at 125–27. And the court found that Treasury responded only in conclusory fashion to a number of comments identifying comparable transactions or explaining why unrelated parties would not share stock-based compensation costs in QCSAs. *Id.* at 127–30. On these grounds, the Tax Court struck down the regulation. *Id.* at 133–34.

On appeal, the Commissioner does not meaningfully dispute the Tax Court's determination that Treasury's analysis under the arm's length standard was inadequate and unsupported. In its opening brief, it contends, instead, "that, in the context of a QCSA, the arm's-length standard does *not* require an analysis of what unrelated entities do under comparable circumstances." Appellant's Br. 57 (internal quotation marks omitted). In the Commissioner's view, Treasury's detailed explanations regarding its comparability analysis were merely "extraneous observations"—"since Treasury reasonably determined that it was statutorily authorized to dispense with comparability analysis in this narrow context, there was no need for it to establish that the uncontrolled transactions cited by commentators were insufficiently comparable." Appellant's Br. 64.

In its supplemental brief, the Commissioner reiterates that—despite its own earlier machinations to the contrary—one should not conflate comparability analysis with the arm's length standard. Appellant's Suppl. Br. 29–31. It also argues for the first time that Treasury's passing reference to the

legislative history of § 482 not only justified its departure from a comparability analysis, but also explained that QCSAs to *develop* intangibles constitute *transfers* of intangibles under the second sentence of § 482.

The majority accepts the latest of the Commissioner's ever-evolving post-hoc rationalizations and then, amazingly, goes even further to justify what Treasury did here. First, it accepts the Commissioner's new explanation that the taxpayer's agreement to "divide beneficial ownership of any Developed Technology" constitutes a transfer of intangibles. E.R. 145. Second, it holds that Treasury's reference to the legislative history communicated its understanding that, when Congress enacted the 1986 amendment, it "delegate[d] to Treasury the choice of a specific methodology to" "ensure that income follows economic activity." Op. 27. The majority finds that Treasury implicitly communicated its understanding that Congress called upon it to move away from a comparability analysis and "to develop methods that [d]o not rely on analysis of" what it deems "problematic comparable transactions" when it sees fit. Op. 28–29. The majority finds that Treasury was therefore entitled to ignore the comparable transactions submitted by commentators because they purportedly did not "bear[] on 'relevant factors' to the rulemaking." Op. 39–40 (quoting *Am. Mining Cong.*, 965 F.2d at 771). As to Altera's rejoinder that Treasury never suggested that it had the authority to "dispense with" the comparability analysis entirely, Appellee's Br. 43, the majority dismisses this argument, stating that, "historically[,] the definition of the arm's length standard has been a more fluid one." Op. 29. Finally, the majority concludes that the second sentence of § 482 not only allowed Treasury to dispense with a comparability analysis *but also allowed it to ignore the arm's length test altogether*.

I do not share the majority's views. Treasury may well have thought—incorrectly, I believe—that QCSAs involving the development of high-profit intangibles constitute transfers of intellectual property under the second sentence of § 482. It may also have believed that, given the fundamental characteristics of stock-based compensation in QCSAs and what the majority here calls the "fluid" definition of the arm's length standard, it could dispense with a comparability analysis entirely, regardless of whether QCSAs constitute transfers. *Cf. Xilinx II*, 598 F.3d at 1197 (Fisher, J., concurring) (hypothesizing why unrelated companies may not share stock-based compensation costs). It may—despite never taking this position before rehearing in this appeal—have even believed that the arm's length standard was not required at all in these circumstances by virtue of the second sentence of § 482. But the APA required Treasury to *say* that it was taking these positions, which depart starkly from Treasury's previous regulations. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.").

The APA's safeguards ensure that those regulated do not have to guess at the regulator's reasoning; just as importantly, they afford regulated parties a meaningful opportunity to respond to that reasoning. Treasury's notice of proposed rulemaking ran afoul of these safeguards by failing to put the relevant public on notice of its intention to depart from a traditional arm's length analysis.**[2]** *See CSX Transp., Inc. v.*

---

**[2]** The majority also glosses over the Tax Court's criticism that the final rule applied to all QCSAs but was based only on Treasury's beliefs about the subset of QCSAs involving "high-profit intangibles" where

*Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (holding that a final rule "violates the APA's notice requirement where 'interested parties would have had to divine [the agency's] unspoken thoughts'" (alteration in original) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259–60 (D.C. Cir. 2005))). Asking Treasury to show its work in the preamble to its final rule—that is, to set forth when and why the agency believed that a comparability analysis is not required or even why an arm's length analysis can be eschewed—does not, as the majority states, "require agencies to provide 'exhaustive, contemporaneous legal arguments to preemptively defend its action.'" Op. 41 (quoting *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 515 (4th Cir. 2011)). It is the essence of the review that the APA demands.

When the Tax Court conducted that review, it considered the explanation that Treasury offered, and it found that Treasury "failed to provide a reasoned basis" for its "belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs." *Altera*, 145 T.C. at 123. The Tax Court set forth in detail why Treasury's explanation for the regulations was insufficient. *Id.* at 125–30. Treasury offers no response to these findings; it simply invites this court to recreate the record and interpret § 482 in a way it never asked the Tax Court to do in order to supply a post-hoc justification for its decisionmaking. I

---

stock-based compensation is a "significant element" of compensation. *Altera*, 145 T.C. at 125–26 (quoting Compensatory Stock Options Under Section 482, 68 Fed. Reg. at 51,173). Treasury's failure to explain this leap and the Commissioner's failure to defend it provide another reason that Treasury failed to comply with the APA.

would hold, as the Tax Court did, that Treasury's belated arguments are insufficient to justify the 2003 regulations and that those regulations are, thus, are procedurally invalid.

## B. *Chevron* Does Not Save Treasury's Flawed Interpretation of Section 482

Even if Treasury did not err procedurally, I would still find that the regulations are impermissible under *Chevron*. The Commissioner does not argue that its interpretation of § 482 is compelled by the unambiguous text of the statute at step one of *Chevron*. Rather, he contends that § 482 does not directly resolve the question of whether Treasury may allocate the cost of stock-based compensation between related parties. The majority similarly reasons that "[§] 482 does not speak directly to whether the Commissioner may require parties to a QCSA to share employee stock compensation costs in order to receive the tax benefits associated with entering into a QSCA." Op. 25. It thus concludes that "there is no question that the statute remains ambiguous regarding the method by which Treasury is to make allocations based on stock-based compensation." Op. 25.

While I agree with the majority and the Commissioner that the statute is silent as to the precise question of whether the Commissioner may require parties to a QCSA to share the cost of stock-based compensation, I believe that the statute unambiguously communicates the types of cases in which each methodology applies. Specifically, § 482 dictates that the status quo—i.e, the arm's length standard—controls in "any case of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests." It also allows Treasury to employ the commensurate with income standard, but only "[i]n the case

of any transfer (or license) of intangible property." Accordingly, the precise gap left by Congress in this case is the question of whether QCSAs constitute a "transfer" of "intangible property" under the second sentence of the statute. If yes, then Treasury may employ the commensurate with income standard to determine if related parties to a QCSAs would share the cost of stock-based compensation. If no, then Treasury must make that determination by employing a comparability analysis to reach an arm's length result. Because the statute does not expressly state that QCSAs for the development intangibles constitute "transfers" of intangibles, I would proceed to step two of *Chevron*.

At step two, we consider whether Treasury's interpretation is "arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011) (internal citations omitted). The agency's interpretation is not arbitrary and capricious if it is "rationally related to the goals of the Act." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999). "If the [agency]'s interpretation is permissible in light of the statute's text, structure and purpose, we must defer under *Chevron*." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007). Accordingly, I begin with the text of the statute.

The statutory text provides in relevant part:

> In any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such

> organizations . . . *if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses*.  In the case of any *transfer (or license) of intangible property* (within the meaning of section 367(d)(4)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Section 482 (emphases added).  It is undisputed that the first sentence of the statute requires an arm's length analysis; even the majority agrees with that longstanding principle.  As previously explained, moreover, at the time Congress amended § 482, the arm's length standard was understood to require a comparability analysis.  But, because transfers of intangible property oftentimes lacked comparable transactions, Congress added a second sentence to the statute.  This sentence allows the Secretary to apply the commensurate with income standard to reach an arm's length result in the case of any *transfer* of intangible property.

The Commissioner contends, based on Treasury's purported belief that QCSAs are transfers of intangible property, that Treasury correctly interpreted § 482 to require that controlled companies share the cost of stock-based compensation.  But, as noted above, Treasury never made, much less supported, a finding that QCSAs constitute transfers of intangible property.  We cannot and should not conclude that the Commissioner's post-hoc interpretation would be permissible when Treasury never articulated such an interpretation.   Even if it had, Treasury's own characterization of QCSAs as arrangements "for the

*development* of high-profit intangibles" contradicts any conclusion that QCSAs constitute *transfers* of already existing intangible property. 68 Fed. Reg. at 51,173 (emphasis added). No rights are transferred when parties enter into an agreement to *develop* intangibles; this is because the rights to later-developed intangible property would spring *ab initio* to the parties who shared the development costs without any need to transfer the property. And, there is no guarantee when the cost-sharing arrangements are entered into that any intangible will, in fact, be developed. In such circumstances, Treasury should not have employed the commensurate with income standard.

The majority attempts to justify Treasury's departure from the comparability analysis in these circumstances by stating it was reasonable for Treasury to "determin[e] that uncontrolled cost-sharing arrangements," such as those submitted by the commentators, "do not provide helpful guidance regarding allocations of employee stock compensation." Op. 28. According to the majority, the legislative history "makes clear" that Congress "intended the commensurate with income standard to displace a comparability analysis where comparable transactions cannot be found." Op. 13. This reasoning fails for several reasons.

As noted, the text of the statute provides that Treasury may employ the commensurate with income standard only in the case of a transfer or license of intangible property—not whenever Treasury finds that uncontrolled transactions fail to provide helpful guidance. Congress did not leave a gap in the statute allowing Treasury to choose when one methodology displaces the other. Rather, it made its own findings regarding the relative helpfulness of comparable uncontrolled transactions in the case of a transfer or license of intangible

property.  It then amended § 482 to allow for the use of the commensurate with income methodology in those specific cases, but not in others.  Congress's findings in the legislative history do not invite Treasury to make its own determinations regarding the helpfulness of other uncontrolled transactions. Nor do they allow Treasury to expand the category of cases in which the commensurate with income standard would apply when the statutory text states otherwise.   Here, Treasury's only justification for eschewing the comparability analysis was its insistence that the legislative history allows it to disregard comparable transactions that it deems imperfect.  This rationale is inconsistent with the plain text of the statute and thus, is impermissible under *Chevron*.

Even if Treasury could dispense with a comparability analysis whenever it believed no comparables exist, that interpretation would still fail step two of *Chevron* because uncontrolled comparable transactions do exist here.  Even the majority acknowledges Treasury's view that a different methodology may only be applied "*when comparable transactions do not exist*."  Op. 41 n.9 (emphasis added). Treasury itself explained, in effect, that a precondition for the applicability of the commensurate with income standard is the lack of real-world comparable transactions with which to make an arm's length comparison.  Such transactions, as Treasury admitted, would "ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard."  68 Fed. Reg. at 51,173. According to the majority, however, imperfect comparables are tantamount to the absence of comparables.

But the arm's length standard of § 482 does not require perfectly identical transactions—only comparable ones.  As Altera notes, the Commissioner cannot "avoid the statutory

limits on his ability to reallocate income by asserting that a related-party transaction is fundamentally different from all similar transactions between unrelated parties by virtue of the very fact that the parties are related." Appellee's Suppl. Br. 33. Such an interpretation would allow Treasury to dispense with the comparability analysis altogether because related parties, by virtue of common ownership, are always positioned differently than unrelated parties. Legislative history can only do so much—if any—work, and it certainly cannot set out an exception that swallows a rule codified by statute.

Even if Treasury were correct that no comparable transactions exist, Treasury's reasoning would still fail. Treasury concluded that it could allocate costs because there were no transactions in which parties at arm's length would even consider taking stock options into account in the context of an arrangement similar to a QCSA. *See* 68 Fed. Reg. at 51,173. But the absence of evidence is not evidence of absence. Indeed, the absence of any comparable transactions could itself mean that uncontrolled taxpayers would not share the costs of stock-based compensation. Treasury believes, however, that uncontrolled taxpayers would not enter into such transactions, and, rather than find the absence of such transactions meaningful to a comparison, believes it is justified in using different methodologies to assess income. But the fact that evidence of the absence of comparable transactions might support more favorable tax treatment does not mean that no comparison can be made.

Finally, while Treasury's interpretation of § 482 is "entitled to no less deference . . . simply because it has changed over time, . . . the agency must nevertheless engage in reasoned analysis sufficient to command our deference."

*Good Fortune Shipping SA v. Comm'r of Internal Rev. Serv.*,
897 F.3d 256, 263 (D.C. Cir. 2018) (internal quotations and
citations omitted); *Judalang v. Holder*, 132 S. Ct. 476, 483
n.7 (2011) (clarifying that the court's analysis of whether an
agency provided a reasoned explanation under *State Farm*
and its analysis of whether an agency's interpretation is
permissible under *Chevron* step two is "the same, because
under *Chevron* step two, we ask whether an agency
interpretation is 'arbitrary or capricious in substance'"). Such
a reasoned explanation, at a minimum, requires Treasury to
"display awareness that it *is* changing position."  *Good
Fortune Shipping*, 897 F.3d at 263 (quoting *Fox*, 556 U.S.
at 515).  "An agency may not, for example, depart from a
prior policy *sub silentio* or simply disregard rules that are still
on the books."  *Fox*, 556 U.S. at 515.  And an agency may
need to "provide a more detailed justification than what
would suffice for a new policy created on a blank slate . . .
when, for example, . . . its prior policy has engendered serious
reliance interests that must be taken into account." *Id.* (citing
*Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 736, 742 (1996)).
"'Unexplained inconsistency' between agency actions is 'a
reason for holding an interpretation to be an arbitrary and
capricious change.'"  *Organized Vill. of Kake v. USDA*,
795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Nat'l
Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967, 981 (2005)).

   As this court held in *Xilinx II*, the previous regulations
preserved the primacy of the arm's length standard and its
requirement of comparability analysis.  *See Xilinx II*,
598 F.3d at 1195–96 (explaining the then-operative version
of Treas. Reg. § 1.482-1).  In amending those regulations,
however, Treasury never indicated—either in the notice of
proposed rulemaking or in the preamble accompanying the

final rule—any awareness that it was changing course. Treasury instead repeated its previous policy that it need not conduct a comparability analysis where no comparable transactions can be found. *See* 68 Fed. Reg. at 51,172–73. It then ignored existing comparable transactions to reach what it claimed was "an arm's length result." *Id.*

The majority contends that this does not constitute a change because, "historically[,] the definition of the arm's length standard has been a more fluid one." Op. 29. But, as explained above, the comparability analysis has always been a defining aspect of the arm's length standard. The mere fact that Treasury may have been inconsistent in the way it has applied the arm's length standard, as the majority contends, does not mean that the statute permits a fluid definition of the standard. *City of Arlington v. FCC*, 569 U.S. 290, 327 (2013) (Roberts, C.J., dissenting) ("We do not leave it to the agency to decide when it is in charge."). Because Treasury departed from the comparability analysis and failed to provide a reasoned explanation for why the commensurate with income standard is permissible under the statute, I would find that Treasury's regulations constitute an impermissible interpretation of the statute at *Chevron* step two.

## C. Stock-based Compensation Is Not a Shared Cost Under Section 482

Because I would find that Treasury's regulations are procedurally and substantively defective, I would interpret the statute in the first instance, without deference. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("*Chevron* deference is not warranted where the regulation is procedurally defective—that is, where the agency errs by failing to follow the correct procedures in issuing the

regulation." (internal quotations and citations omitted)); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("[A]n agency interpretation that is inconsistent with the design and structure of the statute as a whole does not merit deference." (internal citations and quotations omitted)).

Because I would find the 2003 regulations were invalid, I believe that this court's decision in *Xilinx II* controls, and that the Tax Court properly entered judgment in favor of Altera. *Altera*, 145 T.C. at 134. Even if *Xilinx II* did not control, I would hold that related parties in QCSAs need not share costs associated with stock-based compensation.

I agree with the majority that § 482 does not address this issue expressly. But I agree with *amicus curiae* Cisco Systems, Inc. ("Cisco"), that, under the best reading of § 482, QCSAs are not subject to the commensurate with income standard. As Cisco points out, the commensurate with income standard applies only to a "transfer (or license) of intangible property," § 482, which is distinct from a cost sharing agreement for the joint development of intangibles, *see* White Paper, 1988-1 C.B. at 474 (noting that "bona fide research and development cost sharing arrangements" provide a way to "avoid[] section 482 transfer pricing issues related to the licensing or other transfer of intangibles"). The plain meaning of "transfer" indicates shifting ownership of an existing right from one party to another. But under a cost-sharing arrangement, parties agree to develop intangibles together. Because the intangible does not exist at the time the cost sharing arrangement is entered into, there can be no transfer either.

The majority contends that Congress's choice to use the word "any" is significant. It reasons that, because "§ 482

applies '[i]n the case of *any* transfer . . . of intangible property,'" the statute "cannot reasonably be read to exclude the transfers of expected intangible property." Op. 26. But, while "any" can be a broadening modifier, it must be read in the context of its surrounding text. *Cf. United States v. Gonzales*, 520 U.S. 1, 5 (1997) (finding that use of "any" modifies the term it precedes.); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008) (narrowing the effect of "any" based on the context in which it appears because "a word is known by the company it keeps." (internal citations and quotations omitted)).

Here, "any" does not modify "intangible property." Rather, it precedes and thus, applies only to "transfer." This indicates that, while the statutory text may cover any kind of transfer, including expected transfers, it does not cover any kind of intangible property—say, for example, intangible property that does not yet exist. Indeed, § 482 expressly defines the term "intangible property" by referencing the definition provided in § 367(d)(4). *See* § 482 (". . . any transfer (or license) of intangible property (*within the meaning of section 367(d)(4)*)." (emphasis added)). We need not guess at whether Congress intended a broad reading of the term because § 367(d)(4) enumerates specific categories of intangible property covered under the statute, and none of those categories contemplates the mere possibility that intangible property may someday exist.

While "any" may modify "transfer," moreover, QCSAs do not provide for future transfers; rather, as noted above, rights to later-developed intangible property—if ever developed—would spring *ab initio* to the parties who shared the development costs and would thereby dispense with any need to transfer those rights at some time in the future. I

would conclude, absent additional evidence to conclude otherwise, that QCSAs are not transfers subject to the commensurate with income standard under § 482.

Rather, I would find that QCSAs are governed under the first sentence of § 482 and that Treasury may only allocate the cost of stock-based compensation among related companies if unrelated companies dealing at arm's length would do so under comparable circumstances. The evidence of comparable transactions submitted by commentators demonstrates that unrelated companies do not and would not share such costs. Thus, I would hold that an arm's length result is one in which related parties in QCSAs do not share costs associated with stock-based compensation.

The Commissioner contends that the backdrop against which Congress enacted the 1986 amendment demonstrates that Congress intended § 482 to require related companies to share stock-based compensation. But, as the majority admits, "[n]either the Tax Reform Act nor the implementing regulations specifically addressed allocation of employee stock compensation." Op. 17. This is because the practice of providing stock-based compensation did not develop on a major scale until the 1990s—after Congress passed the 1986 amendment. Therefore, Congress could not have been legislating against the backdrop of this particular type of tax avoidance. While it may choose to address this practice now, it cannot be deemed to have done so then.

Not all forms of tax avoidance amount to illegal tax evasion. The very definition of a loophole is a gap in the law or a set of rules. While Treasury may promulgate regulations to close such gaps, it must do so in a manner consistent with its statutory authority under the Tax Reform Act and with the

procedures outlined in the APA.  When it fails to comply with those requirements, its actions cannot be justified by the mere existence of the loophole.  In other words, an arm's length result is not simply any result that maximizes one's tax obligations.  For these reasons, I dissent.